UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

625 MILWAUKEE, LLC,
AVIAD INVESTMENTS, INC.,

      Plaintiffs,

      v.                              Case No. 06-C-0727

SWITCH & DATA FACILITIES COMPANY, LLC,
SWITCH & DATA FACILITIES COMPANY, INC.,

      Defendants.

ORDER GRANTING IN PART AND DENYING IN PART
CIVIL L.R. 7.4 MOTION TO COMPEL AND GRANTING MOTION FOR COSTS

Plaintiffs filed an expedited non-dispositive motion under Civil L.R. 7.4, seeking an order compelling disclosure of the forty-six documents then listed on defendants' privilege log. After the motion was filed, defendants produced thirty-one of the documents; however, fifteen documents remain on the privilege log. The court conducted a hearing regarding disclosure of the remaining documents, at which defendants agreed to tender the documents to the court for in camera review. The court has reviewed the parties' submissions regarding the motion, including the documents listed on the privilege log.

To decide the motion, an understanding of the real estate and corporate transactions behind this case is necessary. In February 2000, defendant Switch & Data Facilities Company, LLC (Switch & Data LLC) incorporated a wholly-owned subsidiary named Switch & Data WI One, LLC (WI One). WI One was a shell entity, with no employees or assets. The intent of Switch & Data LLC and WI One was that WI One would acquire certain property in downtown Milwaukee. Together, Switch & Data LLC and

WI One negotiated the purchase of property at 625 North Milwaukee Street in Milwaukee, Wisconsin, with the owner of the property, Robert John. Switch & Data LLC now admits that during these negotiations it and WI One were both represented by the same counsel, the law firms of Blank Rome and Quarles & Brady. (*See* Defs.' Mot. for Leave to File Suppl. Mem. (Doc. #77), Ex. C; Defs.' Letter dated 10/18/07 (Doc. #96) at 1.) In March 2000, the purchase contract for the 625 North Milwaukee Street property was assigned to WI One. (*Id.*)

In approximately August or September 2000 Switch & Data LLC decided that it and its subsidiary did not wish to own the property. Consequently, Switch & Data commenced discussions with plaintiff Aviad Investments, Inc., as to whether Aviad or an Aviad-related entity would purchase the property and lease it back to Switch & Data LLC or a contemplated new subsidiary, Switch & Data WI Two, LLC (WI Two). Sachnoff & Weaver law firm represented Aviad during these discussions. The deal contemplated that WI One would buy the property and Aviad would purchase WI One. On or about September 25, 2000, Daniel Mann of Blank Rome and Michael Mandell of Sachnoff & Weaver began negotiating the sale or assignment of Switch & Data LLC's membership interest in WI One to Aviad as well as a lease term sheet for the property, with WI One (to be owned by Aviad) as landlord and the new WI Two (to be owned by Switch & Data LLC) as the tenant.

The transactions closed on September 29, 2000, as follows. First, WI One and WI Two signed a Lease Term Sheet. When it was signed, WI One was still owned by Switch & Data LLC. James Lavin, Switch & Data LLC's Vice-Chairman, signed on behalf of the landlord and the tenant – he executed the document for Switch & Data LLC as the

2

member of WI One and again for Switch & Data LLC as the member of WI Two.[1] After the Lease Term Sheet was signed, Switch & Data LLC sold its interest in WI One to Aviad.[2] WI One then purchased the 625 North Milwaukee Street property.

A few months later, WI One changed its name to 625 Milwaukee, LLC. It now sues its former parent, Switch & Data LLC.[3] Also, before and after the sale, WI One acted only through the actions of its sole member. Apparently, it had no executives, officers, or employees and could act only when its sole member acted on its behalf.

The documents remaining on the privilege log fall into four categories: (1) documents predating the sale of WI One concerning negotiation of the Lease Term Sheet, (2) documents predating the sale of WI One concerning the assignment or sale of Switch & Data LLC's membership interest in WI One to Aviad, (3) a document postdating the sale of WI One to Aviad, concerning presale legal services, and (4) other documents postdating the sale of WI One to Aviad. (Defs.' Letter dated 10/18/07 (Doc. #96), Ex. 3.) Defendants claim that fourteen of the fifteen documents are protected by their attorney-client privilege, that two of those fourteen are protected by the work product doctrine, and that one document is protected by the work product doctrine. (*Id.*) Three or four documents predate the sale of WI One, one is a statement for legal services rendered prior to the sale, and the remaining documents postdate the sale of WI One.

---

[1] WI Two did not then legally exist, but that fact is immaterial for purposes of the present motion.

[2] The change in WI One's ownership does not alter its existence.

[3] For clarity in the present decision, the court will continue to refer to the organization as WI One – to emphasize how the organization is one and the same.

3

WI One claims that it is entitled to the documents as part of its prior attorneys' (Blank Rome, and Quarles & Brady) client file. Alternatively, WI One submits that it is entitled to the documents under the common representation doctrine.

The parties agree that Wisconsin law governs the issues of document ownership and attorney-client privilege inasmuch as this is a diversity case. In Wisconsin, "end product" documents such as filed pleadings, final versions of documents prepared for the client's use, and correspondence with the client or opposing counsel belong to the client. *Loeffler v. Lanser (In re ANR Advance Transp. Co.)*, 302 B.R. 607, 614 (E.D. Wis. 2003) (Adelman, J.).

By statute in Wisconsin, a client has the "privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client," and made between the client or the client's representative and the client's lawyer or lawyer's representative or made by the client to a lawyer representing another in a matter of common interest. Wis. Stat. § 905.03(2).

Thus, the "common interest" doctrine is a form of attorney-client privilege for joint legal matters. "Common interest" has been used to describe the "joint client" or "co-client" privilege, "which applies when multiple clients hire the same counsel to represent them on a matter of common interest," and the "community-of-interest" privilege, which occurs when clients with separate attorneys share otherwise privileged information for purposes of a common and coordinated claim or defense. *Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 359 (3d Cir. 2007). Here, the issue is the joint client (or "co-client"), privilege.

4

However, no attorney-client privilege exists between two joint clients when they become adverse to each other in litigation. Wis. Stat. § 905.03(4)(e); *Teleglobe*, 493 F.3d at 359. By statute in Wisconsin, no privilege exists "[a]s to a communication relevant to a matter of common interest between 2 or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between any of the clients." Wis. Stat. § 905.03(4)(e); *accord Boyle v. Kempkin*, 243 Wis. 86, 93 (1943) ("Where an attorney is acting for both parties in drawing up an instrument, the communications made to him are not privileged.").

For this exception to apply, the attorney must actually be "retained or consulted in common by two or more clients," *State v. Hydrite Chem. Co.*, 220 Wis. 2d 51, 77 (Ct. App. 1998); mere representation of one party regarding an *interest* common to another is not enough, *id.* at 76-77. Further, clients of the same lawyer are not necessarily joint clients. "Whether individuals have jointly consulted a lawyer or have merely entered concurrent but separate representations is determined by the understanding of the parties and the lawyer in light of the circumstances." Restatement (Third) of the Law Governing Lawyers § 75 cmt. c. The joint client relationship is limited by the extent of the legal matter of common interest. *Id.*; *accord Teleglobe*, 493 F.3d at 363. An attorney may represent one co-client on matters separate from the common matter. Restatement (Third) of the Law Governing Lawyers § 75 cmt. c.

Once begun, joint-client representation generally continues until the lawyer withdraws or is discharged by one of the clients, or until it becomes clear to all parties that the clients' legal interests have diverged too much to justify using common attorneys. *Teleglobe*, 493 F.3d at 362. However, there must be an express termination or

5

circumstances that "readily imply *to all the joint clients* that the relationship is over." *FDIC v. Ogden Corp.*, 202 F.3d 454, 463 (1st Cir. 2000). The joint-client relationship does not simply evaporate whenever one client determines that its interests have diverged from its co-client's. *Id.* at 463-64 n.6.

In *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343 (1985), the Supreme Court addressed the issue of who controls the attorney-client privilege following a corporate change. The Court noted that

> when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney client privilege passes as well. New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney client privilege with respect to communications made by former officers and directors. Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.

*Id.* at 349. The Court then found that control of a bankrupt corporation's attorney-client privilege passed to the bankruptcy trustee, even with respect to prebankruptcy communications. *Id.* at 358.

Courts have held that *Weintraub* applies equally to the situation in which a subsidiary is sold. In *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 689 F. Supp. 841, 844 (N.D. Ill. 1988), Baxter argued that the new owners of its former subsidiary could not control the attorney-client privilege regarding pre-sale communications between the subsidiary and Baxter's in-house counsel because upon the sale the subsidiary's interests became adverse to its former parent's. The district court found that the subsidiary

6

continued to control its own privilege rights, and was entitled to disclosure of privileged communications after divestiture from Baxter. *Id.* at 344.

> The sale of the stock of Medcom, Inc. preserved Medcom's corporate identity and "assume(d) the ability of successor management to exercise normal management prerogatives." The magistrate correctly concluded that Medcom Holding controls Medcom Inc.'s privilege with respect to attorney-client communications occurring prior to or relating to the sale of Medcom, Inc.

*Id.* Medcom Inc. was entitled to the items for which Baxter claimed a privilege and was then allowed to disclose that information, in its discretion, to its new parent. *See id.; accord Polycast Tech. Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47 (S.D.N.Y. 1989) (finding that subsidiary's attorney-client privilege remained with subsidiary and came under control of its new parent following sale); *see also Bass Public Ltd. v. Promus Cos.*, 868 F. Supp. 615, 620 (S.D.N.Y. 1994) (finding that control of one party's attorney-client privilege in matter of joint representation remained with that party following merger and came under control of its new corporate parent).

The attorney-client privilege belongs to the client; a lawyer may claim the privilege, but only on behalf of the client. Wis. Stat. § 905.03(3); *see Loeffler*, 302 B.R. at 616 n.3. Moreover, the party asserting the privilege bears the burden of establishing that the privilege exists. *Hydrite Chem. Co.*, 220 Wis. 2d at 64.

The first category of documents – pre-sale communications regarding the Lease Term Sheet – must be turned over to WI One as part of its client file and under the doctrine of joint client representation. When the Lease Term Sheet was negotiated and signed, WI One was owned by Switch & Data LLC, and it shared Switch & Data's attorneys.

7

Defendants argue that in negotiations for the Lease Term Sheet WI One was actually represented by Sachnoff & Weaver, the attorneys for WI One's *prospective* owner, Aviad. However, proof of legal relationship between WI One and Sachnoff & Weaver *prior to* the sale of the entity to Aviad has not been presented – there is no engagement letter between WI One (or Switch & Data LLC as WI One's sole member) and Sachnoff & Weaver; no termination of representation letter from Blank Rome or Quarles & Brady to WI One; no correspondence between Sachnoff & Weaver and its supposed client, WI One (or Switch & Data LLC because WI One had no employees of its own who could so communicate), evidencing an attorney-client relationship. Defendants' argument ignores the legal reality of how the transactions were closed. At the time the Lease Term Sheet was signed, WI One was owned by Switch & Data LLC. WI One was not represented by attorneys for the company that did not yet own it. Switch & Data LLC presents no evidence indicating that it ever hired separate counsel for WI One before the date it was sold to Aviad. Thus, the only attorneys who could have been representing Switch & Data LLC at the moment the Lease Term Sheet was signed were Blank Rome and Quarles & Brady.[4]

At his deposition, Attorney Mann, from Blank Rome, indicated that he represented WI One at the time the Lease Term Sheet was executed and until it was sold to Aviad. (Pl.'s Rule 7.4 Mot., Ex. 2 at 98-99.) In an errata sheet to the transcript, Mann

---

[4]According to the Third Circuit,
> It is inevitable that on occasion parents and subsidiaries will see their interests diverge, particularly in spin-off, sale, and insolvency situation. When this happens, it is wise for the parent to secure for the subsidiary outside representation. Maintaining a joint representation for the spin-off transaction too long risk the outcome of . . . cases in which parent companies were forced to turn over documents to their former subsidiaries in adverse litigation.

*Teleglobe*, 493 F.3d at 373.

8

Case 2:06-cv-00727-CNC   Filed 02/29/08   Page 8 of 14   Document 101

tried to "correct[]" this portion of the deposition by stating that he represented Switch & Data LLC and that his contacts were exclusively with Lavin at the parent. (*Id.*, Ex. 4 at 1-2.) The attempted change to the testimony does not persuade the court that Mann's relationship was solely with the parent and that, as a result, no attorney at all represented WI One at the time Lavin was signing documents on its behalf.

Further, Switch & Data LLC, signer of the Lease Term Sheet for both sides, could not separate its own existence or legal representation at that instant between Blank Rome for WI Two and Sachnoff & Weaver for WI One. Switch & Data LLC's argument would have more force if WI One had its own officers and employees, but it did not; it had to act solely through Switch & Data LLC, and Switch & Data LLC has not persuaded the court that prior to the sale of WI One it ever separated its actions on behalf of WI One from those on behalf of itself. Also, what James Lavin knew or communicated during that time for Switch & Data LLC or WI Two, he knew and communicated for WI One as well. At his deposition, Attorney Mann stated that James Lavin asked Mann to prepare a lease term sheet. (Pls.' Rule 7.4 Mot., Ex. 2 at 61-62.) Nothing indicates that in asking for preparation of a lease term sheet Lavin was separating his actions on behalf of Switch & Data LLC from those on behalf of WI One.

Switch & Data LLC contends that where an attorney-client relationship exists primarily at the parent level, a subsidiary cannot discover privileged communications between the parent and its attorneys. (Defs.' Br. in Opp'n at 1-2.) However, the court is persuaded that Blank Rome's relationship was not solely with the parent. Instead, the court is of the view that WI One was being jointly represented by Blank Rome along with Switch & Data LLC. That Blank Rome's legal bills were paid by Switch & Data LLC does

9

not persuade the court that Blank Rome's relationship was with the parent alone and that WI One had no legal representation at all during the time it was buying property and signing lease agreements; apparently, WI One had no money and its representation by counsel meshed with the representation of Switch & Data LLC.

Switch & Data LLC argues that by the time the Lease Term Sheet was negotiated WI One's interests had sufficiently diverged from Switch & Data LLC's such that the joint-client relationship ended. But that is not the case. If one assumes that WI One wanted a good lease from a landlord's perspective, when the Lease Term Sheet was signed Switch & Data LLC wanted that too. Switch & Data LLC wanted WI One to have a lease deal that was attractive to Aviad; otherwise, Aviad would not buy WI One. Moreover, as the Third Circuit stated in *Teleglobe*, parent companies "and their wholly-owned subsidiaries have the same interests because all of the duties owed to the subsidiaries flow back up to the parent." *Teleglobe*, 493 F.3d at 366. At the point that the Lease Term Sheet was negotiated and executed, WI One's interests remained aligned with Switch & Data LLC's.

Regardless of whether Sachnoff & Weaver "negotiated" the terms of the Lease Term Sheet, it represented no party to the Lease Term Sheet. If WI One or WI Two and their attorneys at the time considered what Sachnoff & Weaver and Aviad wanted in the Lease Term Sheet, they did so by their own choice or as part of the business deal they had constructed. That they did so does not mean Sachnoff & Weaver was representing WI One at the time.

From the Revised Privilege Log, attached as Exhibit C to Switch & Data LLC's October 2007 letter, it appears that the documents falling into this category are the

10

September 20, 2000, facsimile as well as the September 27, 2000, facsimile. Moreover, after in camera review, the court is not convinced that the September 20, 2000, facsimile relates to the lease negotiations exclusively. As the document refers to "our Milwaukee Wisconsin site" and not to any lease, it is possible that the fax concerns the sale/purchase of the 625 North Milwaukee Street. Notably, Switch & Data LLC concedes that documents regarding the sale or purchase were part of its joint-client relationship with WI One.

The second category of documents must be disclosed to WI One also. The joint-client representation doctrine extends only to matters of joint or common interest. Regarding the sale of WI One by Switch & Data LLC to Aviad, WI One was the object being sold. Switch & Data LLC argues that Blank Rome represented Switch & Data LLC alone regarding the sale of WI One, without WI One's involvement or interest. While this assertion has some appeal, it does not fit the two documents appearing to fall under this category. The first document is a September 26, 2000, fax from Janet Competello at Blank Rome to Sam Dillhey at Switch & Data LLC. The document reflects a forwarded fax from opposing counsel Mandell at Sachnoff & Weaver asking for the governing documents for WI One – its articles of organization, qualification to do business in Wisconsin, and operating agreement. The forwarded email from Mandell cannot be privileged at all, as it was an unprivileged statement to begin with. The subject of the remainder of the fax arises from Mandell's request for those governing documents for WI One. The court is unconvinced that this communication was outside the joint representation of Switch & Data LLC and WI One by Blank Rome. WI One had an interest in its own governing documents and in making sure that it was properly sold. While Switch & Data LLC could argue more effectively that discussions between counsel and Switch & Data LLC as parent regarding

11

terms of the sale might be a matter of separate representation, it has not persuaded the court that discussions of WI One's governing documents fall outside the joint representation.

Similarly, an undated fax cover sheet appears to predate the sale and concerns WI One's governing documents, including, among other things, its certificate of formation, written action in lieu of special meeting of the WI One manager, and certificate of registration from the State of Wisconsin. Further, Switch & Data LLC has not persuaded the court that the Switch & Data LLC employee who sent this was acting solely on behalf of Switch & Data LLC or that the fax falls outside the joint representation.

One document postdates the sale of WI One but concerns pre-sale activities: Blank Rome's invoice dated October 18, 2000, covering services rendered between September 6, 2000 and September 29, 2000. That too must be disclosed. The invoice states that it refers to the Switch & Data LLC matter of the "purch[ase] of office building @625 N. Milwauk[ee]," and Switch & Data LLC concedes that documents related to the purchase of the property were part of the joint representation. Further, the invoice does not distinguish representation of Switch & Data LLC from representation of both entities. The invoice refers to due diligence several times, which most likely refers to the investigation regarding the property (which is an unprivileged topic); conferences regarding the "new purchaser of Milwaukee site"; and the lease term sheet and lease-back deal (which this court has found to be an unprivileged topic); as well as conferences or work regarding the sale of WI One. Other notations, such as telephone conferences, do not specify that they were regarding a joint matter or a separate matter. The invoice supports the finding that until the sale of WI One on September 29, 2000, the representation of WI

12

One and Switch & Data LLC was joint, and no clear termination of Blank Rome's representation of WI One occurred prior to the sale.

The fourth category of documents does not need to be disclosed to WI One. Immediately upon Switch & Data LLC's sale of WI One to Aviad, the relationship between Blank Rome and WI One was severed; and there is no evidence that Blank Rome had any legal relationship with WI One's new sole member, Aviad, or with WI One after the sale. After the sale of WI One, Blank Rome's consultations with Switch & Data LLC could not in any way be considered consultations in common with WI One because of Switch & Data LLC's sole ownership of WI One or because of a matter of common interest. Once ownership of WI One shifted to Aviad, WI One's interests were clearly separated from those of Switch & Data LLC.[5]

Although one of the eleven documents remaining on the privilege log references the work-product doctrine instead of the attorney-client privilege, the parties' focus solely on the attorney-client privilege. Neither argues the merits of the work-product doctrine. Therefore, this court will decline to rule on that privilege.

Lastly, plaintiffs ask for their costs in bringing the discovery motion. Because Switch & Data LLC turned over thirty-one of the forty-six documents after the motion was filed and this court has ordered four more documents disclosed, plaintiffs are entitled to reasonable expenses they incurred in bringing the motion, under Fed. R. Civ. P. 37(a)(5).

Therefore,

---

[5] The content of the second undated fax cover sheet indicates that it was written after the sale of WI One to Aviad, so the document falls into this fourth category.

13

IT IS ORDERED that plaintiffs' motion to compel is granted as to the documents on the Revised Privilege Log predating September 29, 2000, the undated fax cover sheet regarding WI One governing documents, and the Blank Rome invoice covering September 2000 services, but otherwise is denied as to the documents postdating September 29, 2000.

IT IS FURTHER ORDERED that plaintiffs' request for reasonable expenses under Fed. R. Civ. P. 37(a) is granted. The plaintiff shall submit to the defendant a statement of fees and expenses within 30 days and the defendants shall pay said fees and expenses within fourteen days, unless the parties agree otherwise.

Dated at Milwaukee, Wisconsin, this 29th day of February, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge